**Melody and James FRANK, Appellant,**

v.

**Jerry MATHEWS and Janet Green d/b/a Janet Green Stables, Respondent.**

**No. WD 62842.**

Missouri Court of Appeals, Western District.

June 15, 2004.

---

Eric Eugene Bartlett, Kansas City, MO, Arguing on behalf of Appellant.

Pamela Woolsey Brown, Overland Park, KS, Arguing on behalf of Respondent.

Before RONALD R. HOLLIGER, P.J., ROBERT G. ULRICH, and JAMES M. SMART, JR., JJ.

JAMES M. SMART, JR., Judge.

Melody and James Frank appeal from the trial court's grant of summary judgment in favor of Janet Green, d/b/a Janet Green Stables, and Jerry Mathews. We reverse and remand for further proceedings.

Melody Frank suffered injuries when she fell off a horse while taking riding lessons at Janet Green Stables. The Franks sued the owner of the facility and the riding instructor, Jerry Mathews The court entered summary judgment in favor of the Defendants ruling that (1) Mrs. Frank signed a release of liability form that shielded Defendants from liability and (2) section 537.325 bars suits against "equine activity sponsors" for injuries arising out of such accidents. The Franks appeal.

## Factual Background

The following are the material, undisputed facts which must be considered in the light most favorable to the Franks. *Moran v. Kessler*, 41 S.W.3d 530, 533 (Mo.App. 2001).

Janet Green owns and operates Janet Green Stables ("the Stables"), an equine training and teaching facility. In 2001, Mrs. Frank took eight riding lessons at this facility as part of her undergraduate studies. Prior to Mrs. Frank's first lesson, Jerry Mathews ("Instructor") gave her a one-page Release and Waiver form. Mrs. Frank read the form and signed it. Mrs. Frank testified that she understood the form was designed to release the Stables from liability resulting from accidents caused by the facility's employees or animals.

During her final three lessons, Mrs. Frank rode a horse named Fancy. During her last lesson, Mrs. Frank was engaged in a riding style called posting and trotting. She had previously used this style while riding Fancy. On this occasion, Mrs. Frank held a riding crop given to her by her Instructor. After Mrs. Frank lapped the training facility several times, the Instructor told her to tap the horse's neck with the crop.[1] Mrs. Frank complied; the horse immediately jolted forward and turned at the same time. This caused Mrs. Frank to lose her balance and fall off the horse, which caused significant injuries to her back.

The Franks brought suit against Janet Green, d/b/a Janet Green Stables, and Jerry Mathews ("Defendants"). In their petition, the Franks alleged that the Defendants failed to use reasonable care in evaluating (1) whether Mrs. Frank could safely use the riding crop and (2) whether Mrs. Frank, given her physical condition and experience, could safely manage the horse upon which she rode. They further claimed that as a result of this negligence, Mrs. Frank suffered physical injuries and her husband sustained a loss of consortium and household services. The Defendants filed a motion for summary judgment. They argued that (1) the release form signed by Mrs. Frank shields them

---

[1]. The parties fail to define the term "riding crop" or describe its dimensions. We gather that the "riding crop" in this case was a leather whip.

from liability, and (2) section 537.325 [2] bars the suit because it arises out of an accident resulting from an inherent risk of equine activities. The trial court granted the motion on both grounds. The Franks appeal.

## Analysis

Because the propriety of summary judgment is a question of law, our review is *de novo*. *I.T.T. Commercial Fin. Corp. v. Mid–Am. Marine Supply Corp.*, 854 S.W.2d 371, 376 (Mo. banc 1993). We review the record and all reasonable inferences therefrom in the light most favorable to the non-movant. *Bost v. Clark*, 116 S.W.3d 667, 672 (Mo.App.2003). In evaluating a grant of summary judgment, we use the same criteria employed by the ruling court. *Welch v. Davis*, 114 S.W.3d 285, 292 (Mo.App.2003). Summary judgment is appropriate where the movant shows that he is entitled to judgment as a matter of law and no genuine issues of material fact exist. Rule 74.04(c).

 The right to judgment as a matter of law differs significantly depending upon whether the movant is a "claimant" or a "defending party." *ITT*, 854 S.W.2d at 381. A defending party may establish judgment as a matter of law by showing one of the following: (1) facts that negate any element of the plaintiff's cause of action, (2) the plaintiff, after adequate discovery, has not produced and will not be able to produce sufficient evidence on each element of his claim, or (3) no genuine dispute as to the existence of each of the facts necessary to support the defending party's properly-pleaded affirmative defense. *Id.* at 381. Once the defending party has established a right to judgment as a matter of law, the plaintiff must demonstrate that one or more of the undisput-

ed, material facts is genuinely disputed. *Id.*

## Point I: Release Form

The Franks argue that the trial court erred in granting the Defendant's motion for summary judgment. In their first point on appeal, the Franks contest the trial court's conclusion that the release form signed by Mrs. Frank bars their suit. The Franks point out that in order to relieve the drafter of the release from liability for his own negligence, a release form must contain clear and explicit language. The form here, the Franks claim, lacked such language.

 Exculpatory clauses that exonerate parties from their own future negligence are disfavored, but they are not against public policy. *Alack v. Vic Tanny Int'l of Mo., Inc.*, 923 S.W.2d 330, 334 (Mo. banc 1996). Such clauses, though, will not be implied. *Poslosky v. Firestone Tire & Rubber Co.*, 349 S.W.2d 847, 850 (Mo.1961). Thus, releases must contain conspicuous language that indicates a "clear and unmistakable waiver and shifting of risk." *Alack*, 923 S.W.2d at 337.

 In this case, the parties do not dispute the key facts pertaining to the execution of the release. Nevertheless, they disagree on the effect of that release. Because this issue involves the application of a contract, we decide it as a matter of law. *Howard v. Youngman*, 81 S.W.3d 101, 109 (Mo.App.2002).

The release at issue here is a one-page form. At the top of the form is an explanation of section 537.325 ("Equine Liability Act"). This act bars suits against equine activity sponsors and professionals that arise out of accidents caused by an inherent risk of equine activities. The act, moreover, requires sponsors and profes-

**2.** All statutory references are to Revised Statutes of Missouri (2000).

sionals to include a warning notice in all contracts regarding the provision of such activities. § 537.325.6.[3] Pursuant to this direction, the top of the release form stated:

#### WARNING

Under Missouri law, an equine professional is not liable for an injury to or the death of a participant in equine activities resulting from the inherent risks of equine activities pursuant to the Revised Statutes of Missouri. You are assuming the risk of participating in this domestic animal activity. Inherent risks of domestic animal activities include, but shall not be limited to:

1. the propensity of a domestic animal to behave in ways i.e., running, bucking, biting, kicking, shying, rearing, falling or stepping on, that may result in an injury, harm or death to persons around them;
2. the unpredictability of a domestic animal's reaction to such things as sound, sudden movement and unfamiliar objects, person or other animals;
3. certain hazards such as surface and subsurface conditions;
4. collisions with other domestic animals or objects; and
5. the potential of a participant to act in a negligent manner that may contribute to injury to the participant or others, such as failing to maintain control over the domestic animal or not acting within such participant's ability.

The first sentence of the notice, along with the word "WARNING," identically matches the required statutory notice, *see* § 537.325.6, while the third sentence close-

ly parallels the statutory definition of "inherent risks," *see* § 537.325.1(6).

Near the bottom of the form (just above the signature line), the following additional language appeared:

As a condition to the use of facilities, I hereby release and hold harmless ... Janet Green Stables / Janet Green from any and all liability to or claim for injury to me or my property which may result from my use of [such] facility[.]

The trial court concluded that by signing this form, Mrs. Frank "agreed to hold [the Defendants] harmless for any injuries sustained while at Janet Green Stables."

■ "Contract language is not interpreted in a vacuum, but by reference to the contract as a whole." *Purcell Tire & Rubber Co. v. Executive Beechcraft, Inc.*, 59 S.W.3d 505, 510 (Mo. banc 2001). Thus, the bottom portion of the form here, which purports to bar "any and all" claims arising out of activities at the Stables, must be read in light of the entire one-page contract. In other words, those words must be read in light of their placement below the top portion, which warns that Missouri law bars suits arising out of the inherent risks of participating in the Stables' activities.

■ Moreover, a clause must contain sufficiently explicit language in order to exonerate the drafter from his own future negligence. *Alack*, 923 S.W.2d at 337. The words "negligence" or "fault" are not essential. *Id.* However, "[t]here must be no doubt that a reasonable person agreeing to an exculpatory clause actually understands what future claims he or she is waiving." *Id.* at 337–38.

---

**3.** The Statute also requires sponsors to post signs containing this notice where the activi-

ties are conducted. § 537.325.6.

In light of these principles, the language and placement of the exculpatory clause here leaves doubt that a reasonable person would understand it to waive "any and all" claims resulting from injuries sustained at the Stables. The first half of the form on which this brief clause appears warns that the signer is "assuming the risk of participating in this domestic animal activity." It explains that Missouri law mandates this assumption of risk. And it provides specific examples of inherent risks of equine activities. This section, which appears at the beginning of the release, comprises nearly half of the form. Thus, the release as a whole appears to waive "any and all" claims resulting from the inherent risks of riding lessons alone.

The Defendants point out that Mrs. Frank testified that she understood the form to constitute a release from liability resulting from accidents. This fact, however, is not dispositive. Simply because one accepts the risks inherently associated with a particular activity does not mean that person "was aware of, much less intended to accept, any *enhanced* exposure to injury occasioned by the carelessness of the very persons on which he depended for his safety." *Id.* at 335 (*quoting Gross v. Sweet*, 49 N.Y.2d 102, 424 N.Y.S.2d 365, 400 N.E.2d 306, 310–11 (1979)) (emphasis in original).

The Defendants also appear to argue that the words "any and all claims" make it clear that Mrs. Frank knowingly gave up her right to sue Janet Green Stables (and its employees) for its own negligence. While these words may seem clear in isolation, we do not view them in a theoretical vacuum. *See id.* at 337 (concluding that a release waiving "any and all claims" was insufficient to bar personal injury action). Rather, we evaluate this language in light of its placement below a long recitation of the inherent risks of horseback riding.

Not only is the context of the release language relevant, so too are the circumstances of the agreement. We note that release forms, like the form here, are typically signed by patrons who lack legal expertise. Exculpatory clauses, therefore, are strictly construed against the drafter. *Hornbeck v. All Am. Indoor Sports, Inc.*, 898 S.W.2d 717, 721 (Mo.App.1995). Absent language that signifies a "clear and unmistakable waiver and shifting of risk," these clauses are unenforceable. *Alack*, at 923 S.W.2d at 337.

The exculpatory language here lacks this clarity. Thus, the trial court erred in concluding that the release bars the Franks from suing for *any* injuries Mrs. Frank sustained while at Janet Green Stables. Because the release essentially restates the Equine Liability Act, it has no more effect than the act itself. Therefore, the propriety of summary judgment here depends squarely upon whether that law bars the Franks' suit. In other words, we will affirm the trial court if the Franks' claim arises out of the inherent risks of equine activities.

### Point II: Inherent Risk of an Equine Activity

In their second point on appeal, the Franks contend that the trial court erred in concluding that the Equine Liability Act bars their suit because, they say, three of the statute's exceptions apply. *See* § 537.325.4. They argue that the exceptions make clear that the statute does not protect the activity sponsor from his own negligent or willful acts. According to the Franks, they alleged sufficient facts to establish such acts.

When interpreting a statute, our primary goal is to ascertain the intent of the legislature from the language used. *Kerperien v. Lumberman's Mut. Cas. Co.*, 100

S.W.3d 778, 781 (Mo. banc 2003). If the language is unambiguous, rules of construction are unnecessary. *Id.*

As discussed in our analysis above, the Equine Liability Act bars an equine activity participant from bringing suit against equine activity sponsors and professionals, but only if the suit arises out of the inherent risks of the activity. § 537.325.2. Inherent risks are defined as those "those dangers or conditions which are an integral part of equine activities." § 537.325.1(6). The statute further clarifies this definition by providing a non-exhaustive list of such dangers:

(a) The propensity of any equine to behave in ways that may result in injury, harm or death to persons on or around it;

(b) The unpredictability of any equine's reaction to such things as sounds, sudden movement and unfamiliar objects, persons or other animals;

(c) Certain hazards such as surface and subsurface conditions;

(d) Collisions with other equines or objects;

(e) The potential of a participant to act in a negligent manner that may contribute to injury to the participant or others, such as failing to maintain control over the animal or not acting within his ability[.]

In light of these examples, it appears that the purpose of the Equine Liability Act is to codify the common law assumption of risk principle in the context of a specific recreational activity. The doctrine of assumption of risk bars recovery for injuries where one voluntarily exposes oneself to a danger that is known and appreciated. *Gamble v. Bost,* 901 S.W.2d 182, 187 (Mo. App.1995). The classic example occurs in the sports context. One who participates in a sport assumes (either expressly or

impliedly) those risks inherent in the sport. *Sheppard v. Midway R–1 Sch. Dist.,* 904 S.W.2d 257, 263 (Mo.App.1995) (*citing Scott v. Pac. West Mountain Resort,* 119 Wash.2d 484, 834 P.2d 6, 13 (1992)). Thus, the sponsors of these activities have no duty to protect the participants from these dangers. *Id.* at 263–64. Missouri's Equine Liability Act seems to apply these principles to equine activity sponsors and professionals.

At the same time, sporting participants do not assume the risks created by the sponsor's negligence. *Martin v. Buzan,* 857 S.W.2d 366, 369 (Mo.App.1993). Sponsors are not, therefore, relieved from liability for every failure to exercise due care. *See Sheppard v. Midway R–1 Sch. Dist.,* 904 S.W.2d at 264 (while long jumper assumed the risk of a bad landing, he did not relieve high school of duty to provide a reasonably safe jumping pit). Consistent with this principle, the Equine Liability Act enumerates several exceptions. The language provides:

[T]his section shall not prevent or limit the liability of an equine activity sponsor, an equine professional or any other person if the equine activity sponsor, equine professional or person:

(1) Provided the equipment or tack and knew or should have known that the equipment or tack was faulty and such equipment or tack was faulty to the extent that it did cause the injury; or

(2) Provided the equine and failed to make reasonable and prudent efforts to determine the ability of the participant to engage safely in the equine activity and determine the ability of the participant to safely manage the particular equine based on the participant's age, obvious physical condition or the participant's representations of his ability;

(3) Owns, leases, rents or otherwise is in lawful possession and control of the land

or facilities upon which the participant sustained the injuries because of a dangerous latent condition which was known to the equine activity sponsor, equine professional or person for which warning signs have not been conspicuously posted;

(4) Commits an act or omission that constitutes willful or wanton disregard for the safety of the participant and that act or omission caused the injury;

(5) Intentionally injures the participant;

(6) Fails to use that degree of care that an ordinarily and prudent person would use under the same or similar circumstances.

§ 537.325.4. These exceptions illustrate that the Equine Liability Act (like general assumption of risk principles) does not protect sponsors and professionals from their own culpable acts. Moreover, the sixth exception, which states the general standard of care in negligence cases, illustrates that the Act was not intended to relieve sponsors and professionals from any duty that common law negligence principles impose upon them. *See* 57A Am.Jur. 2d *Negligence* § 133.

The parties do not dispute that Janet Green Stables and the Instructor are both "equine activity sponsors" within the statute.[4] Rather, the issue is whether the Franks alleged a claim arising out of the inherent risks of horseback riding or a claim arising out of a negligent or willful act that is not covered by the statute. The trial court concluded that the accident resulted from the sudden movement of a horse that caused Mrs. Frank to lose her balance. Because these events are inherent risks of riding a horse, the court fur-

ther concluded that the Equine Liability Act bars the Franks' suit.

In their petition, however, the Franks alleged that the risks of falling were created by the defendants' affirmative negligent and reckless acts and were not inherent risks of horseback riding itself. Thus, if the record contains evidence that supports any of their allegations, we must necessarily conclude that the Equine Liability Act does not bar their suit.

### Failure to Evaluate Horse

First, the Franks alleged that the Defendants failed to use reasonable care in evaluating whether Mrs. Frank, given her physical condition and experience, could safely manage the horse from which she fell. The Franks basically contend that the Defendants failed to properly investigate whether the horse was suitable for Mrs. Frank's riding lessons.

Prior to Mrs. Frank's fall, the record reflects that the horse had been at the Stables for one or two months. The Franks do not specifically allege that this timeframe suggests that it was unsafe for Mrs. Frank to ride the horse. Nor do they specifically allege that (1) a horse is not suitable for formal lessons if it has not previously participated in such lessons or (2) it is unsafe for a rider to strike a horse with a crop if that horse has not previously been subjected to such treatment. Instead, they appear to imply that these facts combine to show that the Defendants did not use reasonable care in matching Mrs. Frank with this particular horse.

The record, however, fails at this point to substantiate this theory. Green testified that when she told the horse owner that she planned to use the horse for

---

**4.** Section 537.325.1(4) includes employees of sponsors within the statutory definition. Thus, the Instructor receives the same protection under the statute as the Stables. Inci-

dentally, it is also possible that the Instructor could be classified as a professional under the statute. Section 537.325.1(5) includes horseback riding instructors within the definition.

riding lessons, the owner did not indicate any concerns. While it appears that the horse did not previously participate in a "formal" training program, the Instructor testified that the owner's children frequently rode the horse. The record also contains evidence that when the horse arrived at the Stables, the Defendants took steps to ensure that the horse was suitable for riding lessons. Green testified that the Instructor and other advanced riders rode the horse for around a week when it arrived. The horse, according to Green, showed no alarming signs. The record further shows that prior to Mrs. Frank's fall, this horse was used for riding lessons on a daily basis, without any indication that any other student had difficulty riding her. The Franks thus far fail to show that they have any evidence that the Defendants breached any affirmative duty to evaluate the horse.

### Failure to Properly Instruct Concerning the Riding Crop

The Franks' petition contained an additional allegation that the Defendants were negligent, if not reckless, in giving Mrs. Frank a riding crop and telling her to strike the horse with it. The Franks claimed that the Defendants failed to use reasonable care in evaluating whether Mrs. Frank could safely use the crop. The parties dispute whether the Instructor gave Mrs. Frank the implement. Mrs. Frank testified that the Instructor gave her the crop because the horse had been lethargic. In his deposition testimony, Mathews stated he could not recall giving Mrs. Frank a crop. He testified that, given Mrs. Frank's skill and experience, he "would have to say" that he did not give her one. Janet Green testified that in the equestrian training industry, each rider is evaluated on a case-by-case basis. Instructors give crops only to those riders who possess the requisite skill level, according to Green. Riders of Mrs. Frank's caliber, Green explained, are not usually given riding crops.

Neither the Instructor nor Green definitively stated that Mrs. Frank should not have been given a riding crop, or that doing so would create undue risk of injury. They simply indicated that a beginner is not typically given a crop. Nor did they explain the nature of any risks associated with giving an inexperienced rider such as Mrs. Frank a crop.

The record provides little clarification on this issue. Neither party purports to provide expert testimony on the issue of duty. This is an appeal from summary judgment, and we must accord the Franks all reasonable inferences that the evidence tends to support. *Bost,* 116 S.W.3d at 672. Thus, we assume for purposes of reviewing the court's order that inexperienced riders are not usually provided crops because it poses a risk of injury to such riders.

Whether the instructor gave Mrs. Frank the crop is a disputed material fact. The significance of any such act is also disputed. We cannot say, as a matter of law, on the basis of *this* record, that giving a riding crop to an inexperienced rider and telling the rider to strike the horse on the neck is not an affirmative act of negligence that constitutes the proximate cause of the injury. As a result, we cannot say at this time that the injuries here arose out of the inherent risks of horseback riding. The trial court erred when it concluded otherwise.

A duty to exercise due care can arise out of the relationship between the parties. *Hoover's Dairy, Inc. v. Mid-Am. Dairymen, Inc.,* 700 S.W.2d 426, 432 (Mo. banc 1985). The law imposes an obligation upon anyone who undertakes to render services to another—whether gratuitously

or for consideration—to exercise some degree of care and skill in the performance of those services. RESTATEMENT (SECOND) OF TORTS § 323 (1965); *see also Strickland v. Taco Bell Corp.*, 849 S.W.2d 127, 132 (Mo.App.1993). In this case, the Defendants were obligated to exercise the care that a reasonably careful equine professional or sponsor would exercise in the same or similar circumstances. *See Horner v. Spalitto*, 1 S.W.3d 519, 522 (Mo.App. 1999) (explaining pharmacist's duty in same terms). For example, if the Instructor carelessly chose to fire a large caliber firearm into the air while near the horse, it could hardly be said that the sudden bolting of the horse is an inherent risk of equine activity, thereby shielding the Instructor from liability for any resulting injury.

Equine activity sponsors and professionals possess a level of expertise. Participants typically rely on this expertise, especially in the context of horseback riding lessons. In this case, Mrs. Frank signed up for lessons in conjunction with her undergraduate studies. She had no prior experience with horses. Common law negligence principles imposed a duty upon the Instructor and Green to exercise due care for her safety. Pursuant to the Equine Liability Act, Mrs. Frank assumed the risks inherent in the activity of horseback riding. She did not, however, assume any enhanced exposure to those risks that may have been caused by the Instructor's negligent supervision. *See Fielder v. Acad. Riding Stables*, 49 P.3d 349 (Colo.Ct.App. 2002) (substantially similar statute did not bar action where instructors negligently failed to remove a screaming 11-year-old rider from her horse).

The statutory language suggests that the Equine Liability Act does not relieve riding instructors or stable owners of any duty to exercise reasonable care. The Franks alleged that the Instructor's negligent act of giving an inexperienced rider a crop—rather than the inherent risks of horseback riding—caused Mrs. Frank's injuries. Because neither the statute nor the common law precludes this theory of liability, the Defendants were not entitled to judgment as a matter of law. We do not know at this point whether the Franks will necessarily be able to prove their theory. We simply cannot say at this time as a matter of law that the theory is precluded by the principles of assumption of risk codified within section 537.325.

### Conclusion

For the foregoing reasons, we reverse the court's grant of summary judgment and remand for further proceedings consistent with this opinion.

HOLLIGER and ULRICH, JJ., concur.