

# In the
# Missouri Court of Appeals
## Western District

| | | |
|---|---|---|
| CRISTINA RAYBOURN, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| V. | ) | |
| | ) | |
| CHANGING LEADS EQUINE | ) | **WD86708** |
| RESCUE, | ) | |
| | ) | **OPINION FILED:** |
| Respondent; | ) | **DECEMBER 10, 2024** |
| | ) | |
| WOODSON HILL EQUESTRIAN | ) | |
| CENTER, LLC, | ) | |
| | ) | |
| Respondent. | ) | |

**Appeal from the Circuit Court of Platte County, Missouri**
The Honorable W. Ann Hansbrough, Judge

Before Division Three: Mark D. Pfeiffer, Presiding Judge, Gary D. Witt, Judge and
Thomas N. Chapman, Judge

Cristina Raybourn appeals the judgment of the Circuit Court of Platte County,

Missouri ("motion court") granting defendants' motions for summary judgment. On

appeal, Raybourn claims that the motion court erred in granting the motions for summary

judgment because: 1) the liability waivers Raybourn signed were not supported by

consideration and were thus invalid; 2) there are issues of material fact as to whether the conduct at issue is covered by the waivers; and 3) the alleged negligent conduct of the defendants falls outside of section 537.325 RSMo.'s limited liability protections, commonly referred to as the Equine Liability Act.[1]  We affirm the judgment of the motion court.

## Factual and Procedural Background[2]

Defendant Changing Leads Equine Rescue ("CLER") is a non-profit horse rescue located in Kansas City, Missouri.  CLER cared for rescue horses and made efforts to place the horses in adoptive homes.  CLER utilized volunteer workers to help care for the horses by cleaning stalls, feeding and watering horses, and walking horses to and from the stable.  CLER leased its stable and pasture land from defendant Woodson Hill Equestrian Center, which ran an equine boarding operation and conducted riding and training lessons at its own facilities next door.

In June of 2019, Raybourn began volunteering for CLER on most Wednesday afternoons.  Before Raybourn started volunteering for CLER, she had very little experience with horses, but she did know that horses could be dangerous and could kick if they were startled.  Raybourn knew to always put her hand on the horse's bottom if she ever went to its back side so it would know she was there.  Although Raybourn states that

---

[1] All statutory citations are to RSMo 2016 as updated through the most recent cumulative supplement, unless otherwise indicated.
[2] Set forth are the material, undisputed facts, which must be considered in the light most favorable to Raybourn, the party against whom the judgment was entered. *Frank v. Mathews*, 136 S.W.3d 196, 198 (Mo. App. W.D. 2004).

she had no formal training with the horses, she did some "hands-on training" with an experienced volunteer or trainer when she was at CLER on Wednesdays; they would show her what to do.

On July 17, 2019, and again on August 24, 2019, Raybourn signed a Volunteer Liability Waiver. The two waivers were identical and read:

**Volunteer Liability Waiver**

**VOLUNTEERING IN EQUINE ACTIVITIES CAN BE DANGEROUS. WE REQUIRE ALL VOLUNTEERS TO ASSUME ANY AND ALL RISK BY SIGNING THE FOLLOWING RELEASE:**

I WISH to participate as a volunteer for Changing Leads Equine Rescue, on premises at the above location, owned by Premise Owners noted above. My volunteer activities include, but are not limited to cleaning stalls, feeding horses, walking horses to and from the barn, general property maintenance, assisting with Fuzzy Horse Show Circuit and other fundraising activities. *I agree to abide by the CLER "Guidelines for Volunteers" and I understand that I may not do any activity not specifically taught at Volunteer Training sessions. I also understand that the CLER Board has the right to deny me participation in volunteer activities if my behavior is inconsistent with the "Guidelines for Volunteers."*

AS A VOLUNTEER, I understand that equestrian activities can be dangerous and the Stable, Premise Owners or Organization cannot anticipate, identify, modify, or eliminate the inherent danger of equestrian activities. I will be near horses which can be excitable, difficult to control and unpredictable on the premises where this activity is taking place. **I AGREE TO TAKE FULL RESPONSIBILITY FOR MYSELF.**

**THE UNDERSIGNED, on behalf of myself, my personal representatives, assigns, heirs and next of kin, hereby release, indemnify and will hold harmless the Stable, Premise Owners, and Organization, and any of their affiliates, directors, officers, equestrian trainers, employees, other volunteers, and all individual members and agents thereof (hereinafter "The Released Parties"), from litigation or claims of any kind for injury, damages or death arising from my activities as a volunteer, including any instance arising from the alleged negligence of the Released Parties.**

3

**I further agree that my participation as a volunteer constitutes an "equine activity", and that I have read this state's Equine Activity Liability Act warning Missouri Statute, 537.325 (1994).**

Warning
Under Missouri law, an equine professional is not liable for an injury to or the death of a participant in equine activities resulting from the inherent risks of equine activities pursuant to the Revised Statutes of Missouri.

I further agree to waive all liability of the Released Parties for any loss, injury, damage or death which arises from the "inherent risks" of an equine activity, including those arising out of the alleged negligence of the "released parties".  "Inherent risks of an equine activity", means a danger or condition that is an integral part of an equine activity, including, but not limited to, any of the following:  (a) Propensity of an equine to behave in ways that may result in injury, death, or loss of persons on or around the equine; (b) The unpredictability of an equine's reaction to sounds, sudden movement, unfamiliar objects, persons, or other animals; (c) Hazards, including, but not limited to, surface or subsurface conditions; (d) A collision with another equine, another animal, a person, or an object; (e) The potential of an equine activity participant to act in a negligent manner that may contribute to injury, death, or loss to the person of the participant or to other persons, including, but not limited to, failing to maintain control over an equine or failing to act within the ability of the participant. "Released Parties" in this document refers to:  Stable, Premise Owners, Organization, Clinicians, Sponsors and/or each of their respective directors, officers, employees, agents and/or volunteers.

\* \* \*

**MY SIGNATURE BELOW CONSTITUTES ACCEPTANCE OF THE ABOVE TERMS AND CONDITIONS; I HAVE READ AND UNDERSTOOD THIS LIABILITY RELEASE.**

(emphasis original).  When Raybourn signed the August 24 waiver, she also attended a two-hour volunteer orientation, where volunteers could ask questions.  All of the volunteers were informed that if they were ever uncomfortable around a horse at any

4

given time to let someone know, because the volunteers were never required to do something that made them uncomfortable.

During her volunteer sessions, Raybourn had walked horses, including a horse named Paradise, but had not ever had to walk any horse very far. Raybourn stated that there was usually another volunteer with her when she walked the horses.

On December 25, 2019, Raybourn volunteered to take a shift at CLER; there was only one other volunteer present that day because it was Christmas Day. Raybourn and the more experienced volunteer knew that they would be on their own, and they agreed to volunteer under those conditions. On December 25, 2019, CLER had only one rescue horse on the property, Paradise. Because horses are social animals and should not be kept alone, Paradise was being temporarily housed in the Woodson Hill stable instead of CLER's stable. Raybourn was asked to walk Paradise from the CLER corral to the Woodson Hill stable, which, according to Raybourn, was "far" from the CLER stable, "150 feet, 200 feet. I'm not sure. But it was much farther than the [CLER] barn." Raybourn walked Paradise out of the CLER corral, and then, although Paradise had not done anything that day to make Raybourn uncomfortable, Raybourn told the more experienced volunteer that she did not want to walk Paradise that far; she asked the more experienced volunteer to take the reins. The other volunteer took Paradise's reins, and, although the other volunteer did not see it happen, she thought Raybourn was standing toward the rear-end of Paradise when Paradise kicked Raybourn in the face, causing Raybourn to suffer significant injuries including a brain injury, facial lacerations, and a

5

broken jaw. Raybourn does not remember anything after she handed the reins to the other volunteer.

Raybourn sued both CLER and Woodson Hill, alleging premises liability, negligence, and misrepresentation. Both CLER and Woodson Hill filed separate motions for summary judgment on the basis that Raybourn's claims were barred by both the liability waivers she had signed and by the Equine Liability Act. The motion court granted summary judgment to both defendants on both grounds. This appeal follows.

## Standard of Review

The motion court grants summary judgment "based on the pleadings, record submitted, and the law; therefore, this Court need not defer to the [motion] court's determination and reviews the grant of summary judgment *de novo*." *Goerlitz v. City of Maryville*, 333 S.W.3d 450, 452 (Mo. banc 2011). We review the record in the light most favorable to the party against whom judgment was entered. *McNearney v. LTF Club Operations Co.*, 486 S.W.3d 396, 401 (Mo. App. E.D. 2016). "Summary judgment is only proper if the moving party establishes that there is no genuine issue as to the material facts and that the movant is entitled to judgment as a matter of law. *Goerlitz*, 333 S.W.3d at 452.

## Analysis

The motion court granted summary judgment to both defendants on two grounds: that the liability waivers Raybourn signed were not ambiguous and shielded the defendants from liability, and that the incident giving rise to Raybourn's injuries fell within the provisions of the Equine Liability Act, also shielding the defendants from

6

liability. Because we find the second ground dispositive, we need not address the waiver issues.

In Point IV of Raybourn's brief, she argues that the "negligent" conduct of the defendants in this case falls outside of the Equine Liability Act. This statutory scheme was thoroughly analyzed in *Frank v. Mathews*, 136 S.W.3d 196 (Mo. App. W.D. 2004), and revisited in *Rosales v. Benjamin Equestrian Center, LLC*, 597 S.W.3d 669 (Mo. App. W.D. 2019), which relies heavily on *Frank*. Both opinions are consistent with the plain language of the statute.

"[T]he Equine Liability Act ("ELA") bars an equine activity participant from bringing suit against equine activity sponsors and professionals, but only if the suit arises out of the inherent risks of the activity[.]" *Frank*, 136 S.W.3d at 202 (citing §537.325.2). "Inherent risks are defined as [] 'those dangers or conditions which are an integral part of equine activities.'" *Id*. (quoting § 537.325.1(6)). Such dangers include, but are not limited to:

> (a) The propensity of any equine or livestock to behave in ways that may result in injury, harm or death to persons on or around it;
>
> (b) The unpredictability of any equine's or livestock's reaction to such things as sounds, sudden movement and unfamiliar objects, persons or other animals;
>
> (c) Certain hazards such as surface and subsurface conditions;
>
> (d) Collisions with other equines, livestock, or objects;
>
> (e) The potential of a participant to act in a negligent manner that may contribute to injury to the participant or others, such as failing to maintain control over the animal or not acting within his ability[.]

Section 537.325.1(6). *Frank* noted these examples and surmised that the purpose of the

ELA was "to codify the common law assumption of risk principle in the context of a

specific recreational activity[, which] bars recovery for injuries where one voluntarily

exposes oneself to a danger that is known and appreciated." *Frank*, 136 S.W.3d at 202.

The ELA provides that, with certain exceptions which will be discussed below,

[A]n equine activity sponsor, an equine professional, . . . any employee thereof, or any other person or corporation shall not be liable for an injury to or the death of a participant resulting from the inherent risks of equine . . . activities and, except as provided in subsection 4 of this section, no participant or a participant's representative shall make any claim against, maintain an action against, or recover from an equine activity sponsor, an equine professional, . . . any employee thereof, or any other person from injury, loss, damage or death of the participant resulting from any of the inherent risks of equine . . . activities.

Section 537.325.2. An "equine activity sponsor" is

an individual, group, club, partnership or corporation, whether or not operating for profit or nonprofit, legal entity, or any employee thereof, which sponsors, organizes, or provides the facilities for, an equine activity, including but not limited to pony clubs, 4-H clubs, hunt clubs, riding clubs, school- and college-sponsored classes, programs and activities, therapeutic riding programs and operators, instructors and promoters of equine facilities, including but not limited to stables, clubhouses, pony ride strings, fairs and arenas at which the activity is held[.]

Section 537.325.1(4). An "equine activity" includes:

(a) Equine shows, fairs, competitions, performances or parades that involve any or all breeds of equines and any of the equine disciplines, including, but not limited to, dressage, hunter and jumper horse shows, grand prix jumping, three-day events, combined training, rodeos, driving, pulling, cutting, polo, steeplechasing, English and western performance riding, endurance trail riding and western games and hunting;

(b) Equine training or teaching activities or both;

(c) Boarding equines;

(d) Riding, inspecting or evaluating an equine belonging to another, whether or not the owner has received or currently receives monetary consideration or other thing of value for the use of the equine or is permitting a prospective purchaser of the equine to ride, inspect or evaluate the equine;

(e) Rides, trips, hunts or other equine activities however informal or impromptu that are sponsored by an equine activity sponsor; and

(f) Placing or replacing horseshoes on an equine[.]

Section 537.325.1(3).

Raybourn argues that the activities that CLER volunteers performed were not "equine activities" as defined in the statute. Her primary justification for this position is that "[n]o Missouri court has ever interpreted 'equine activity' under R.S.Mo. § 537.325 to include volunteer duties[.]" We find this unpersuasive. The ELA expressly includes non-profit organizations, which traditionally utilize volunteer labor, as "equine activity sponsors," and that definition also expressly includes "stables." Section 537.325.1(4). In addition, "equine activity" is defined to include "boarding equines." Section 537.325.1(3). The activities in which the CLER volunteers were "participants" clearly related to the boarding of the rescue horses—feeding and watering, cleaning stalls, and walking horses to and from the stables. That Raybourn herself did not provide the stables for the rescue horses does not mean that she did not participate in boarding activities. Moreover, Raybourn signed two waiver forms that included the statement, "I further agree that my participation as a volunteer constitutes an 'equine activity'" and specifically references the ELA. We conclude that the volunteer activities in which Raybourn participated were equine activities as defined in the ELA.

9

Raybourn also argues that her accident is not covered by the ELA because it did not arise from the inherent risks of the equine activity. The ELA sets forth several circumstances under which the immunity protections do not apply. These "exceptions" in subsection 4 of the ELA, include where the equine activity sponsor:

> (1) Provided the equipment or tack and knew or should have known that the equipment or tack was faulty and such equipment or tack was faulty to the extent that the equipment or tack caused the injury; or
>
> (2) Provided the equine . . . and failed to make reasonable and prudent efforts to determine the ability of the participant to engage safely in the equine activity . . . and determine the ability of the participant to safely manage the particular equine . . . based on the participant's age, obvious physical condition or the participant's representations of his or her ability;
>
> (3) Owns, leases, rents or otherwise is in lawful possession and control of the land or facilities upon which the participant sustained injuries because of a dangerous latent condition which was known to the equine activity sponsor, equine professional, . . . any employee thereof, or person and for which warning signs have not been conspicuously posted;
>
> (4) Commits an act or omission that constitutes willful or wanton disregard for the safety of the participant and that act or omission caused the injury;
>
> (5) Intentionally injures the participant; [or]
>
> (6) Fails to use that degree of care that an ordinarily careful and prudent person would use under the same or similar circumstances.

Section 537.325.4. Raybourn is correct insofar as the ELA "does not protect sponsors and professionals from their own culpable acts." *Frank*, 136 S.W.3d at 203. "Moreover, the sixth exception, which states the general standard of care in negligence cases, illustrates that the Act was not intended to relieve sponsors and professionals from any duty that common law negligence principles impose upon them." *Id.*

10

*Rosales* found that the equine activity sponsor was not shielded from liability because the participant's injuries did not come from risks inherent to the equine activity, but rather, the equine activity sponsor's negligence "enhanced the risk of injury" that the participant consequently suffered because the sponsor did not prevent spectators from accessing the equine unloading area. *See Rosales*, 597 S.W.3d at 676. *Frank*, using similar reasoning, reversed a grant of summary judgment and remanded for a determination of whether the risk of the participant's injury was inherent to the activity itself or created by the defendant's affirmative negligent and reckless acts because the sponsor's employee instructed an inexperienced rider to use a riding crop on the horse she was riding, who then threw her off. *Frank*, 136 S.W.3d at 203.

Raybourn contends that CLER negligently enhanced her risk of injury in several ways removing her injury from the protections of the ELA. First, Raybourn alleged that CLER failed to train her to safely handle horses and failed to follow or distribute its own training materials. However, Raybourn testified in her deposition that she had "hands-on training" with an experienced volunteer or trainer when she was at CLER on Wednesdays; they would show her what to do. Raybourn also admitted that she knew before the day she was injured that she should always put her hand on the horse's bottom if she ever went to its back side so it would know she was there. A CLER trainer had evaluated Raybourn after she had been volunteering for several months and "cleared" her to perform her volunteer activities with the horses;[3] while Raybourn said she had no

---

[3] While Raybourn answered "Contested" in answer to this fact, her response was that she neither knew she had been cleared, nor was she present when it happened. This does not refute

11

knowledge of having been "cleared," she does not set forth any evidence that it did not happen.

Next Raybourn argues that CLER "[k]new Paradise exhibited dangerous propensities." Raybourn's only evidence to support this assertion is a page of handwritten notes contained in the summary judgment record that refers to Paradise as having been "very stressed and sweaty" on September 17, 2019, over three months before Raybourn's accident. The document is unsigned, is not on letterhead, does not contain the name of the author, and is not authenticated in any manner. "Hearsay statements cannot be considered in ruling on the propriety of summary judgment. Only evidence that is admissible at trial can be used to sustain or avoid summary judgment. Documents, to be admissible, must meet authentication and hearsay foundational requirements." *First Nat'l Bank v. Shirla Howard Revocable Living Tr.*, 561 S.W.3d 434, 437 (Mo. App. S.D. 2018) (internal quotation omitted). Even if the document had been authenticated, it fails to establish that Paradise exhibited dangerous propensities or that CLER was aware of those propensities. The notes appear to attribute the "stressed and sweaty" condition to a possible ulcer, which was being treated. Again, this was over three months before Raybourn was injured, and there is no evidence other than Paradise having been "stressed and sweaty" on that particular day as a result of a possible ulcer, that he was dangerous.

---

the testimony that the "clearing" determination was an informal process that happened internally, after the volunteer has been observed and asked whether they are comfortable with every task or if they have any questions. In any event, Raybourn's "cleared" status is not dispositive, as it just means that the volunteer is able "to do the responsibilities required without a senior volunteer monitoring over them[,]" and Raybourn was accompanied by a senior volunteer when she was injured.

Raybourn had walked Paradise from the CLER corral previous to December 25, 2019, and she testified in her deposition that Paradise had done nothing on December 25 to make her uncomfortable. There is no other evidence to suggest Paradise was a dangerous animal.

In her response to the Motion for Summary Judgment, Raybourn sets forth the following reasons why she argues CLER was negligent;

> On the day Plaintiff was injured, Defendant CLER 1) knew changing the horse's routine would lead to increased risks to Plaintiff; 2) knew walking a horse further would lead to increased risk to Plaintiff; 3) knew and "expected" the horse Paradise would become increasingly anxious; 4) knew these risks increased the chanced [sic] Plaintiff would be injured.

The bulk of Raybourn's argument is that CLER had asked Raybourn to walk Paradise, by herself, from the CLER corral to the Woodson Hills stable, which was "much farther" than she had ever walked a horse before and exceeded her experience because she had never walked a horse by herself before. Raybourn elaborates that moving Paradise to the Woodson Hills stable was a "chang[e] in the horse's routine" that "would increase the risk that Raybourn was injured." While all of this might be relevant if Raybourn had been injured while she was walking Paradise to the Woodson Hills stable by herself, that did not, in fact, occur. When she was injured, Raybourn had walked Paradise out of the CLER corral, which she had done before. This case is analogous to *Martin v. City of Washington*, 848 S.W.2d 487, 493 (Mo. banc 1993), where our Supreme Court held, "Although the parties' briefs concentrate on the existence and the extent of the [defendant's] duty to [the plaintiff], this case actually turns on the element of causation.

13

The simplest test for proximate cause is whether the facts show that the injury would not have occurred in the absence of the negligent act."

When Raybourn was injured, Paradise's routine had not yet been changed; Raybourn had just removed him from the CLER corral, which she had done before. Although Raybourn had been asked to walk Paradise to the Woodson Hills stable, she had not begun that walk when she asked the other volunteer to take over. She was not alone with the horse at the time of the accident. Raybourn was accompanied by another, more experienced volunteer. And when Raybourn notified the other volunteer that she was not comfortable walking Paradise to the Woodson Hills stable, the other volunteer took the reins from her. None of the actions that Raybourn alleges increased her risk of injury had occurred at the time of the accident. She was doing the very activities she acknowledged on the waiver form that she signed were the "equine activities" that she would be performing as a volunteer and that she had been performing since she had begun volunteering. She points to no evidence that either defendant did anything to increase her risk of injury beyond the inherent risks of the volunteer equine activity that she had previously been performing and was covered by the ELA. Accordingly, the ELA shields both defendants from liability for Raybourn's unfortunate injuries.

## Conclusion

For all of the above-stated reasons, we affirm the motion court's grant of summary judgment as to both defendants.

_____
Gary D. Witt, Judge

All concur